UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY CROMWELL,<br><br>              Plaintiff,<br><br>      v.<br><br>KAISER FOUNDATION HEALTH PLAN,<br><br>              Defendant. | Case No. 18-cv-06187-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT**<br><br>Docket Nos. 42, 49 |

In this suit, Ashley Cromwell alleges that Kaiser Foundation Health Plan ("Kaiser") violated ERISA. The action relates to health benefits for Ms. Cromwell's daughter who has autism. Currently pending before the Court are two motions: (1) Kaiser's motion for summary judgment pursuant to Rule 56 and (2) Ms. Cromwell's motion for judgment pursuant to Federal Rule of Civil Procedure 52.[1]

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Kaiser's motion. Because the Court is granting Kaiser's motion, Ms. Cromwell's motion is **DENIED**.

---

[1] In conjunction with the motions, Kaiser has filed a copy of the administrative record and asks that it be sealed in its entirety as it is "replete with personal information." Docket No. 48 (Mot. at 3). Because the administrative record does contain a great deal of personal information, particularly as to Ms. Cromwell's minor daughter, the Court **GRANTS** Kaiser's motion in the first instance; however, for the limited number of documents on which Ms. Cromwell is actually relying (from the administrative record), only portions need to be redacted. Accordingly, the Court also **GRANTS** Ms. Cromwell's motion to seal only portions of the documents submitted. *See* Docket No. 46 (motion).

The following facts are undisputed by the parties.

A.     Ms. Cromwell's Health Benefits Plan

Covenant Care California, LLC ("Covenant Care") sponsors a health benefits plan for its employees, including Ms. Cromwell. *See* Compl. ¶ 5. When a claim for health benefits is made under the plan, Kaiser administers and adjudicates the claim. In addition, Kaiser funds any benefits delivered under the plan. *See* Compl. ¶ 7. During the relevant period, Ms. Cromwell's daughter, who has autism, was covered by the health benefits plan. *See* Compl. ¶ 5.

There is an agreement between Covenant Care and Kaiser related to the health benefits plan. That agreement is titled "Group Agreement." The Group Agreement is the plan document for the health benefits plan. The Group Agreement incorporates by reference several documents, including but limited to a document titled "Evidence of Coverage."[2] *See, e.g.*, Campins Decl., Ex. G (2017-2018 Group Agreement at 1) (providing that "[t]his Group Agreement (Agreement), including the Evidence of Coverage (EOC) document(s) listed below, the group application that Group submitted to Health Plan, and any amendments to any of them, all of which are incorporated into this Agreement by reference, constitute the contract between Kaiser Foundation Health Plan, Inc. (Health Plan) and COVENANT CARE CALIFORNIA, LLC (Group)") (emphasis omitted); Campins Decl., Ex. H (2018-2019 Group Agreement at 5) (providing the same).

Under the Group Agreement, Covenant Care delegated to Kaiser "the discretion to determine whether a Member is entitled to benefits under this Agreement. In making these determinations, Health Plan has discretionary authority to review claims in accord with the

---

[2] In her motion, Ms. Cromwell argues that the Group Agreement is the plan document and that the EOC is simply a summary plan description. *See* Pl.'s Mot. at 8-9. However, this argument lacks merit because the Group Agreement incorporates the EOC by reference. *See, e.g., Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 137 (5th Cir. 2016) ("Typically, the terms of a SPD are not controlling unless the SPD is incorporated into the plan."); *Sullivan-Mestecky v. Verizon Communs., Inc.*, No. CV 14-1835 (SJF)(AYS), 2018 U.S. Dist. LEXIS 36676, at *18 (E.D.N.Y. Mar. 5, 2018) ("The GLI Plan document states that it incorporates by reference any summary plan descriptions relative to the plan. The Plan's eligibility requirements for participation under the life insurance plan are set forth in the Plan's summary plan description as follows: . . . .").

United States District Court
Northern District of California

United States District Court
Northern District of California

procedures contained in this Agreement and to construe this Agreement to determine whether the Member is entitled to benefits." Campins Decl., Ex. G (2017-2018 Group Agreement at 6); Campins Decl., Ex. H (2018-19 Group Agreement at 10).

B.     Kaiser's Change in Coverage

There was a change in the health benefits plan starting on June 1, 2018. That change affected how much Ms. Cromwell had to pay for her daughter's autism speech therapy. Prior to June 1, 2018, Ms. Cromwell paid $20 per visit for the speech therapy, without being subject to a plan deductible. Starting on June 1, 2018, Ms. Cromwell would have had to pay the full cost of the speech therapy up to the amount of the plan deductible ($2,000), after which she would be charged $20 per visit.

Kaiser informed Ms. Cromwell of the change on or about December 18, 2017. In its letter to Ms. Cromwell, Kaiser stated:

> The new change affects how much members diagnosed with autism or pervasive developmental disorders will have to pay for physical, occupational, and speech therapy visits.
>
> - How it currently works – Physical, occupational, and speech therapy visits are administered at a copay or coinsurance under your plan's mental health benefits.
>
> - When your plan renews in 2018 – These visits will be part of your plan's standard physical, occupational, and speech therapy benefits. This means you'll need to pay the full charges for physical, occupational, and speech therapy visits until you reach your deductible. Then you'll start paying a copay or a coinsurance.

Campins Decl., Ex. D (letter). Kaiser stated that the "change [was] being made" because, "[u]nder California Senate Bill 946, physical, occupational, and speech therapy aren't considered mental health services. Consistent with this state law, these services are now covered under your plan's standard physical, occupational, and speech therapy benefits." Campins Decl., Ex. D.

On or about April 5, 2018, Ms. Cromwell wrote to Kaiser, stating, *inter alia*, that she "strongly disagree[d] with Kaiser's decision to reclassify speech therapy as a non-mental health service. . . . [Her daughter] has a diagnosis of autism, a mental health disorder. Speech therapy is a prescribed mental health treatment for her condition." Campins Decl., Ex. E (letter).

3

1    Kaiser responded to Ms. Cromwell on or about April 25, 2018. The response included the

2 following statement:

3    I discussed your concern with the Regulatory Consultant of the
Benefits Interpretation and Consulting Department. The Consultant
4    explained that SB 946 outlines how Health Plans must cover
behavioral health treatment. It includes information such as, but not
5    limited to, maintaining an adequate network of Autism providers
who may authorize and provide behavioral health treatment plans. It
6    also defines autism providers. The Consultant continued that SB
946 does not indicate physical, occupational and speech therapy
7    services as behavioral health treatments or mental health services.

8    As a result, the plan was updated to be consistent with the
definitions of behavioral health providers outlined in SB 946. This
9    means that speech therapy is now covered under the "Rehabilitative
and Habilitative Services" benefit. Physical, occupational and
10    speech therapy services are covered services for all members that
have a medical need for such services, regardless of whether the
11    member's medical need is related to a physical condition or mental
health condition. However, physical therapists, occupational
12    therapists, and speech pathologists are not classified as mental
health providers.

13

14 Campins Decl., Ex. F (letter).

15    On or about June 25, 2018, Ms. Cromwell wrote to Kaiser again, stating, *inter alia*, "I have

16 read Senate Bill 946 and am unable to locate any language stating that speech therapy related to

17 autism is not a behavior health treatment." AR 94. Ms. Cromwell further stated: "[L]anguage

18 contained in SB 946 supports speech therapy is intended to be covered as a behavioral health

19 treatment for individuals diagnosed with autism." AR 95 (emphasis in original).

20    On or about July 25, 2018, Kaiser responded. The response included the following

21 statement:

22    I confirmed that physical, occupational and speech therapy services
are skilled care services that are covered when a plan provider
23    determines medical[] necessity. These services will be covered
under the "Rehabilitative and Habilitative Services" benefit.

24

25    Speech therapy services are covered under the same benefit for
members with autism or members without autism having a wide
25    range diagnosis. This change was mandated by state law (Senate
Bill 946) and Kaiser Permanente became compliant on January 1,
26    2018.

27

28 AR 113.

4

C.     Ms. Cromwell's Grievance with the California Department of Managed Health Care

Subsequently, Ms. Cromwell filed a grievance with the California Department of Managed Health Care ("DMHC").[3]  On or about August 15, 2018, DMHC responded to Ms. Cromwell, stating, *inter alia*, as follows:

> Your complaint asserted that the carve-out for speech therapy services related to autism violated the Mental Health Parity Act and Senate Bill 946.  However, my investigation did not uncover that the 2018 EOC treated mental health benefits unfavorably towards medical and surgical benefits.  Concerning Senate Bill 946, my investigation found that Senate Bill 946 outlines how a health plan must provide coverage for behavior health treatment and maintain an adequate network.  It does not appear to explicitly prevent a health plan from covering speech therapy services related to autism under the 'Rehabilitative and Habilitative Services' benefit.  It also does not appear to explicitly prevent a health plan from subjecting such services to a plan deductible.

AR 16.

D.     The California Mental Health Parity Act and the "Autism Mandate"

The California Mental Health Parity Act, codified at California Health & Safety Code § 1374.72, provides in relevant part as follows:

> Every health care service plan contract . . . that provides hospital, medical, or surgical coverage shall provide coverage for the diagnosis and **medically necessary treatment** of severe mental illnesses of a person of any age, and of serious emotional disturbances of a child . . . **under the same terms and conditions applied to other medical conditions** . . . .

*Id.* § 1374.72(a) (emphasis added).  "The terms and conditions . . . that shall be applied equally to all benefits under the plan contract[] shall include, but not be limited to, [*inter alia*] [c]opayments."  *Id.* § 1374.72(c)(2).  "[T]he stated intent of the Parity Act is simple: to address the imbalance in coverage between mental illnesses and physical illnesses."  *Rea v. Blue Shield of*

---

[3] "Under California law, the deference a court should accord to an agency's interpretation of a statute is 'fundamentally situational.'"  *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 716-17 (9th Cir. 2012).  In the instant case, there is little to suggest that the Court should afford the DMHC's interpretation of Senate Bill 946 (and the California Mental Health Parity Act) with much, if any, deference.  *See id.* (considering, *inter alia*, whether "'the agency has a comparative interpretive advantage over the courts'" – *e.g.*, "if the subject matter of the statute is especially technical or complex, or if the agency is interpreting its own regulation").

*Cal.*, 226 Cal. App. 4th 1209, 1226 (2014); *see also* 1999 Cal. Stats. Ch. 534, § 1(b)(2) (finding of the California legislature that, *inter alia*, "[m]ost private health insurance policies provide coverage for mental illness at levels far below coverage for other physical illnesses").

Senate Bill 946, codified at California Health & Safety Code § 1374.73, addresses pervasive developmental disorder and autism in particular. It provides, *inter alia*, that

> [e]very health care service plan contract that provides hospital, medical, or surgical coverage shall also provide coverage for behavioral health treatment for pervasive developmental disorder or autism . . . . The coverage shall be provided in the same manner and shall be subject to the same requirements as provided in Section 1374.72.[4]

Cal. Health & Safety Code § 1374.73(a)(1).

## II.      DISCUSSION

### A.      Legal Standard

As an initial matter, the Court notes that, technically, it has two different procedural motions before it: (1) Kaiser's motion for summary judgment pursuant to Rule 56 and (2) Ms. Cromwell's motion for judgment pursuant to Rule 52.

Rule 56 provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255. Where a defendant moves for summary judgment on a claim for which the plaintiff has the burden of proof, the defendant may prevail simply by pointing to the plaintiff's failure "to make a

---

[4] "'Behavioral health treatment' means professional services and treatment programs, including applied behavior analysis and evidence-based intervention programs, that develop or restore, to the maximum extent practicable, the functioning of an individual with pervasive developmental disorder or autism and that meet [certain] criteria." Cal. Health & Safety Code § 1374.73(c)(1).

showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Rule 52 concerns, *inter alia*, findings and conclusions by a court in the context of a bench trial. It provides in relevant part as follows: "*In General.* In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). In *Kearney v. Standard Insurance Co.*, 175 F.3d 1084 (9th Cir. 1999), the Ninth Circuit indicated that, where there is an ERISA dispute, a trial based on the administrative record alone may be conducted. That is,

> the district court may try the case on the record that the administrator had before it. This is vastly less expensive to all parties, accomplishes the policies enacted as part of the statute, and also gives significance, which would otherwise largely evaporate, to the administrator's internal review procedure required by the statute.

*Id.* at 1095; *see also id.* at 1094 (stating that "[a] full trial de novo in any ERISA dispute where there was a genuine dispute of fact as to whether the individual qualified for a benefit would undermine" the policies underlying ERISA; "[t]he means that suggests itself for accomplishing trial of disputed facts, while preserving the value of the fiduciary review procedure, keeping costs and premiums down, and minimizing diversion of benefit money to litigation expense, is trial on the administrative record, in cases where the trial court does not find it necessary under *Mongeluzo* to consider additional evidence").[5] "In a trial on the record, but not on summary judgment, [a] judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id.* at 1095.

B.     Standard of Review

Whether the Court is considering Kaiser's summary judgment motion or Ms. Cromwell's request for a trial based on the administrative record, the parties agree that the Court evaluates Kaiser's substantive decision to deny benefits for an abuse of discretion. *See, e.g.*, Pl.'s Mot. at 3-4 (asserting that, on a Rule 52 motion, a court determines "whether the adverse benefit decision

---

[5] In *Mongeluzo*, the Ninth Circuit "held . . . that the district court had discretion to allow evidence that was not before the plan administrator 'only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review.'" *Kearney*, 175 F.3d at 1090.

represented an abuse of discretion").

> Under this deferential standard, a plan administrator's decision "will not be disturbed if reasonable." This reasonableness standard requires deference to the administrator's benefits decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record."

*Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012).

Ms. Cromwell adds, however, and Kaiser does not contest, that the abuse-of-discretion review must be tempered by skepticism because "Kaiser operates under a structural conflict [due to] its dual role as the Plan's administrator and insurer." Pl.'s Mot. at 4 (citing *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)); *see also Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 707 (9th Cir. 2012) (noting that abuse-of-discretion review "is tempered by skepticism when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits"; adding that "[a] conflict arises most frequently where . . . the same entity makes the coverage decisions and pays for the benefits") (internal quotation marks omitted). In *Harlick*, the Ninth Circuit only applied "some skepticism" because "the record before us does not indicate whether [the insurance company] has a history of bias in claims administration or whether it has taken any steps to promote accurate decisionmaking." *Id.* at 707-08 (noting that a conflict is given "more weight" where there is such a history and that a conflict is considered "less important" where active steps are taken). In the instant case, the record before the Court does not indicate a history of biased claims administration and reflects at most only limited steps taken to promote accurate decisionmaking (*e.g.*, an internal consultation with a Regulatory Consultant of the Benefits Interpretation and Consulting Department). Accordingly, the Court also applies "some skepticism" in the case at bar.

C.    Violation of ERISA v. Violation of State Law

As an initial matter, the Court addresses Kaiser's contention that Ms. Cromwell's sole remaining ERISA claim, *see* 29 U.S.C. § 1132(a)(1)(B) (providing that "[a] civil action may be brought . . . to clarify [the participant or beneficiary's] rights to future benefits under the terms of the plan"), should be dismissed because her only position is that Kaiser's actions violate the California Mental Health Parity Act (as incorporated in California Health & Safety Code §

1374.73), which is state law and not ERISA law. Ms. Cromwell has not asserted a separate free-standing claim for violation of the California Mental Health Parity Act (as incorporated in § 1374.73).

In response, Ms. Cromwell makes two arguments:

(1) an ERISA claim may always be predicated on state law so long as that state law is protected by ERISA's savings clause (*i.e.*, is not preempted), *see* 29 U.S.C. § 1144(a), (b)(2)(A) (providing that "the provisions of this title and title IV shall supersede any and all State laws insofar as they may not or hereafter relate to any employee benefit plan," but "nothing in this title shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities"), and

(2) if a plan document provides that the plan shall comply with state law, then state law effectively becomes a plan term and an ERISA claim may always be brought based on a failure to comply with a plan term. *See id.* § 1132(a)(1)(B) (providing that "[a] civil action may be brought . . . to clarify [a participant or beneficiary's] rights to future benefits *under the terms of the plan*") (emphasis added); *cf. id.* § 1132(a)(3) (providing that a participant, beneficiary, or fiduciary may bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or *the terms of the plan*") (emphasis added).

Ms. Cromwell's first argument is unpersuasive. ERISA's savings clause means that some state claims are not preempted, but that does not mean those state claims are thereby deemed ERISA claims; the state claims are still state claims. *Cf., e.g.*, *Harlick*, 686 F.3d at 703 (holding that the terms of the insurance plan itself did not require the insurer to pay for the plaintiff's care at a residential treatment facility for her anorexia but that the California Mental Health Parity Act did require such); *see also Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, 856 F.3d 686, 692 (9th Cir. 2017) ("conclud[ing] that [California Insurance Code] § 10110.6(a) is not preempted [by ERISA] and applies to Boeing's Plan").

The authority cited by Ms. Cromwell is not to the contrary. For example, *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), addresses what happens to a state claim when it *is* preempted

by ERISA (not when it is *not* preempted).  *See id.* at 209 (stating that "the ERISA civil enforcement mechanism is one of those provisions with such 'extraordinary pre-emptive power' that it 'converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule'" and, "[h]ence, 'causes of action within the scope of the civil enforcement provisions . . . [are] removable to federal court'").

As for *Commercial Life Insurance Co. v. Superior Court*, 47 Cal. 3d 473 (1988), there, the California Supreme Court simply indicated that a statute in the California Insurance Code was preempted by ERISA.  The court added that, even if the state statute was "found to be within the scope of the [ERISA] savings clause as a law regulating insurance," the statute would still be preempted because it allowed for remedies not available under ERISA.  *Id.* at 483.

> We find no merit in the argument that if there is any conflict between ERISA remedies and [California Insurance Code] section 790.03, subdivision (h) remedies, such conflict was created by Congress when it enacted ERISA's preemption clause and saving clause.  The argument asserts that the saving clause allows states to regulate insurance and hence to enact conflicting remedies.  However, while the saving clause may allow states to enact statutes that regulate the *substantive* terms of insurance policies, the clause does not allow states to enact statutes that provide conflicting *procedural* remedies.  A contrary rule would undermine ERISA's important policy of promoting uniformity in employee benefit-plan remedies, by creating the potential for conflicting standards of recovery.

*Id.* at 484 (emphasis in original).  Nothing in *Commercial Life* indicates that a state claim that is not preempted by ERISA is itself deemed an ERISA claim.

Finally, *Townsend v. Thomson Reuters Group Disability Income Insurance Plan*, 807 F. Supp. 2d 924 (C.D. Cal. 2011), provides at best only limited support for Ms. Cromwell.  In *Townsend*, the defendant moved to dismiss the plaintiff's complaint based, *inter alia*, "on the fact that Plaintiff is allegedly bringing a cause of action for *benefits* . . . under [California Insurance Code] Section 10144."  *Id.* at 926 (emphasis added).  The court stated that the complaint did "not bring a cause of action for benefits under Section 10144," but rather brought a cause of action for benefits under ERISA, simply using "Section 10144 as the relevant rule of decision here in alleging that Defendants wrongfully terminated Plaintiff's LTD benefits."  *Id.*  The court, however, did not address how state law could be a predicate for an ERISA violation.  If anything,

*Townsend* provides support for Ms. Cromwell's second argument.

The Court therefore turns to Ms. Cromwell's second argument – *i.e.*, that the plan document in the instant case incorporates state law by reference, thus making state law part of the plan terms and thus providing a basis for an ERISA claim. This second argument presents a close call. In the Group Agreement (which Ms. Cromwell concedes is the plan document), there is a section titled "Governing Law" which provides as follows: "Except as preempted by federal law, this Agreement will be governed in accord with California law and any provision that is required to be in this Agreement by state or federal law[] shall bind Group and Health Plan whether or not set forth in this Agreement." Campins Decl., Ex. H (2018-2019 Group Agreement at 11) (emphasis omitted). According to Ms. Cromwell, "this Agreement will be governed in accord with California law" means that the plan will *comply* with California law, but there appears to be some ambiguity – *i.e.*, arguably, the sentence simply means that California law *applies* to the Group Agreement, particularly given the title of the section (*i.e.*, "Governing Law"). For instance, California law may simply affect the Agreement's interpretation or enforceability. On the other hand, it may be argued that under a literal reading, the Agreement incorporates all aspects of applicable California law, including substantive requirements.

For purposes of the pending motions, the Court need not resolve what is meant by the statement "this Agreement will be governed in accord with California law," because, even if Ms. Cromwell should have asserted a separate state law claim (and not just an ERISA claim), the Court could allow her to amend in the state law claim and assert supplemental jurisdiction over that claim. This would be the most efficient way of proceeding given that the parties have been litigating this case for almost a year and the case is now at its end stage. The Court thus addresses the merits of the instant case – *i.e.*, has Kaiser violated the California Mental Health Parity Act ("Parity Act") as incorporated by § 1374.73?

D.    Is there a Violation of the Parity Act?

The starting point for the Court's analysis is why Kaiser denied Ms. Cromwell's claim for benefits. As indicated above, Kaiser made three statements regarding its denial of benefits.

(1) On or about December 18, 2017, Kaiser stated in a letter to Ms. Cromwell that,

11

1    "[u]nder California Senate Bill 946, physical, occupational, and speech therapy

2    aren't considered mental health services.  Consistent with this state law, these

3    services are now covered under your plan's standard physical, occupational, and

4    speech therapy benefits."[6]  Campins Decl., Ex. D (letter).

5    (2) On or about April 25, 2018, Kaiser told Ms. Cromwell that, according to its

6    Regulatory Consultant, "SB 946 does not indicate physical, occupational and

7    speech therapy services as behavioral health treatments or mental health services.

8    [¶] As a result, the plan was updated to be consistent with the definitions of

9    behavioral health providers outlined in SB 946.  This means that speech therapy is

10    now covered under the 'Rehabilitative and Habilitative Services' benefit.  Physical,

11    occupational and speech therapy services are covered services for all members that

12    have a medical need for such services, regardless of whether the member's medical

13    need is related to a physical condition or mental health condition.  However,

14    physical therapists, occupational therapists, and speech pathologists are not

15    classified as mental health providers."  Campins Decl., Ex. F (letter).

16    (3) On or about July 25, 2018, Kaiser stated to Ms. Cromwell: "I confirmed that

17    physical, occupational and speech therapy services are skilled care services that are

18    covered when a plan provider determines medical[] necessity.  These services will

19    be covered under the "Rehabilitative and Habilitative Services" benefit.  [¶] Speech

20    therapy services are covered under the same benefit for members with autism or

21    members without autism having a wide range diagnosis.  This change was

22    mandated by state law (Senate Bill 946) and Kaiser Permanente became compliant

23    on January 1, 2018."  AR 113.

24    As indicated by the above, nowhere did Kaiser assert that speech therapy was not

25

26

27  [6] The Court acknowledges Ms. Cromwell's point that behavioral health, and not mental health, is actually at issue in this case. *See* Cal. Health & Safety Code § 1374.73.  However, such references to mental health instead of behavioral health are not material to the analysis herein.  In any event, Kaiser does reference behavioral health in its later communications.

28

medically necessary for Ms. Cromwell's daughter.[7]  Rather, its point was that speech therapy was treated the same, whether for someone with a mental condition or a physical condition.  According to Kaiser, this is all that the Parity Act requires.

Ms. Cromwell argues that Kaiser violated the Parity Act because speech therapy is a critical part of treatment for autism – that is, coverage for autism is being treated differently from coverage for physical conditions because critical treatment for autism (*i.e.*, speech therapy) costs more as a result of the deductible than critical treatment for physical conditions which are not subject to the deductible.  *See, e.g.*, Pl.'s Mot. at 6. ("Kaiser has chosen to treat [autism speech therapy] *differently* from other in-patient services by making those treatments more expensive than similar types of treatments for physical conditions – indeed, it also treats them differently from other out-patient autism treatments.") (emphasis in original); Pl.'s Mot. at 7 ("[The Parity Act] specifically commands that [autism speech therapy] be provided on the same terms as all other crucial in-patient services for non-mental health, or non-autism conditions."); Pl.'s Mot. at 7 ("[T]he consideration is not between [autism speech therapy] and non-autism speech therapy, but *treatment for autism* – of which [autism speech therapy] is one of the most useful and prominent – and treatment for physical conditions.") (emphasis in original).

In evaluating whether Kaiser has violated the Parity Act, the Court must first consider the language of the Act.  *See Baxter v. St. Teachers' Ret. Sys.*, 18 Cal. App. 5th 340, 356 (2017) (stating that, where the language of a statute is clear, its plain meaning should be followed).  The Act provides in relevant part that

> [e]very health care service plan contract . . . that provides hospital, medical, or surgical coverage shall provide coverage for the diagnosis and medically necessary **treatment** of severe mental illnesses of a person of any age, and of serious emotional disturbances of a child . . . **under the same terms and conditions applied to other medical conditions** . . . .

---

[7] It is somewhat confusing that Kaiser at times stated that speech therapy is not mental health treatment or services.  But Kaiser never rejected coverage for speech therapy (*e.g.*, as not medically necessary or as not otherwise falling within coverage).  *See also* Def.'s Opp'n at 4 (arguing that the speech therapy would not be *administered* as mental health benefits but rather administered as part of speech therapy visits).

Cal. Health & Safety Code § 1374.72(a) (emphasis added). Kaiser literally has complied with the Parity Act because: (1) Kaiser has provided coverage for the medically necessary "treatment" of autism – *i.e.*, speech therapy; and (2) Kaiser has provided the speech therapy on the "same terms and conditions" as applied to all medical conditions. All persons requiring speech therapy – whether for a physical or mental/behavior condition such as autism – must pay the $2,000 deductible before the $20 co-pay process is triggered. *Cf. Harlick*, 686 F.3d at 712 (stating that "plans that come within the scope of the [Parity] Act must cover all 'medically necessary' treatment for 'severe mental illnesses,' . . . but can apply the same financial conditions – such as deductibles and lifetime benefits – that are applied to coverage for physical conditions"); *see also Doe v. BlueCross BlueShield of Tenn., Inc.*, No. 2:17-cv-02793-TLP-cgc, 2018 U.S. Dist. LEXIS 126845, at *22 (W.D. Tenn. July 30, 2018) (in addressing claim for disparate impact brought by HIV/AIDS patients against insurer, noting that "plan enrollees who are not disabled yet take specialty medications subject to the Program must endure the same procedural and logistical hurdles that HIV/AIDS patients face[;] [t]his is fatal to Plaintiff's claim because Plaintiff cannot allege that [the insurer] forces HIV/AIDS patients to obtain their medications").

In response, Ms. Cromwell argues that, even though Kaiser formally treats speech therapy for autism and speech therapy for other medical conditions the same, Kaiser's approach more severely impacts treatment for autism than treatment for other medical conditions. This is because speech therapy is a more core component of treatment for autism than for other conditions.

However, Ms. Cromwell's argument is based on an assumption for which she has not provided any substantiating evidence. *Cf. Summit Estate, Inc. v. Cigna Healthcare of Cal., Inc.*, No. 17-CV-03871-LHK, 2017 U.S. Dist. LEXIS 167462, at *30 (N.D. Cal. Oct. 10, 2017) ("Plaintiff's complaint contains no allegation that Defendants provided terms of coverage for mental health treatment different from that of other medical treatment. Again, a health plan violates § 1374.72 [the Parity Act] only if the plan's terms of coverage for treatment of 'severe mental illnesses' and 'serious emotional disturbances of a child' are different from the plan's terms of coverage for other medical treatments. Plaintiff provides no comparison of the difference in Defendants' terms of coverage for mental health treatment versus other medical treatment.").

14

Although speech therapy may constitute a core treatment for autism, one could equally characterize speech therapy as a core treatment for some patients who have suffered a stroke, physical therapy as a core treatment for someone who has sustained a severe and disabling injury to their nervous system; or occupational therapy as a core treatment for someone who has suffered severe brain injury. Like speech therapy for autism, all of these critical treatments for other medical conditions would be subject to the $2,000 deductible.

Furthermore, the approach that Ms. Cromwell endorses poses extremely difficult, if not impossible, manageability problems. How is a court, let alone an insurer, to determine whether a treatment is "core" or "critical," particularly given a wide assortment of medical conditions? If so, what happens when medical experts disagree? To evaluate parity vis-à-vis autism or other mental/behavioral condition, what medical condition(s) should be used as a comparator? Ms. Cromwell's approach seems to have no logical stopping point. *Cf. Alexander v. Choate*, 469 U.S. 287, 298-99 (1985) (holding that the Rehabilitation Act's anti-discrimination provision cannot be interpreted "to reach all action disparately affecting the handicapped"; "[b]ecause the handicapped typically are not similarly situated to the nonhandicapped," a broader conception of disparate impact would potentially mean that every policy having an effect on persons with disabilities could trigger liability, and therefore "reject[ing] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504").

In the final analysis, Ms. Cromwell points to nothing in the language or the legislative history of the Parity Act suggesting how the Act applies to an asserted disparity where a policy on its face treats mental and physical conditions equally. Although the DMHC's interpretation of the Parity Act may be entitled to little deference, it is noteworthy that its interpretation is in accord. Nor has Ms. Cromwell pointed to any convincing case authority supporting her interpretation of the Act.

The main case on which Ms. Cromwell relies, *Micheletti v. State Health Benefits Commission*, 913 A.2d 842 (N.J. Super. Ct. App. Div. 2007), is distinguishable. In *Micheletti*, although the plaintiff's son's treating physicians prescribed speech and occupational therapy as medically necessary, a state Commission denied benefits for such therapy based on a "contractual

15

*exclusion* of benefits for non-restorative speech, physical and occupational therapy" – *i.e.*, because "the therapies were sought to develop skills or improve skills that were not fully developed [*i.e.*, previously demonstrated]." *Id.* at 846, 850 (emphasis added.) The plan totally *excluded* speech and occupational therapy for autism, while providing such therapy to those suffering, *e.g.*, a stroke. *Cf. Rea*, 226 Cal. App. 4th at 1236 (stating that "Blue Shield's construction would *exclude* one of the most effective treatments for anorexia and bulimia [*i.e.*, residential treatment][;] one of the primary legislative purposes of the Parity Act will be thwarted because victims of eating disorders will not receive effective treatment . . . .") (emphasis added). Here, the plan at issue does not totally exclude therapy for autism while providing therapy to other non-developmental physical conditions. The plan formally treats such therapy equally regardless of the underlying diagnosis. *Micheletti* did not address the question of whether providing facially equal coverage can constitute an unlawful disparity.

The Court acknowledges the hardship imposed upon Ms. Cromwell and her family as a result of Kaiser's change in policy terms. The Court also acknowledges the new policy may seem to impose a singularly burdensome financial cost on patients with autism for whom speech therapy may be so core and important to treatment. But the Court cannot discern anything in the language or legislative history of the California Mental Health Parity Act which prohibits the change Kaiser has implemented. Nor is there an agency interpretation or court decision supporting Ms. Cromwell's asserted application of the Act.

///

///

///

///

///

///

///

///

///

### III.     <u>CONCLUSION</u>

For the foregoing reasons, the Court grants Kaiser's motion for summary judgment. Whether Ms. Cromwell's claim is predicated on ERISA or state law, there is no genuine dispute of material fact that Kaiser did not violate the Parity Act.

As the Court grants Kaiser's summary judgment motion, it must deny Ms. Cromwell's Rule 52 motion.

This order disposes of Docket Nos. 42 and 49. The Clerk is instructed to enter Judgment and close the file.

**IT IS SO ORDERED**.

Dated: September 23, 2019

_____
EDWARD M. CHEN
United States District Judge